IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

Sandra O'Hara- Harmon
Plaintiff

C. A. No.: 3:19-cv-00601-WHA

VS.

Facebook, Inc. et.al.



PLAINTIFF RESPONSE TO DEFENDANT'S MOTION TO DISMISS

Plaintiff hereby responds in opposition of Defendant's Motion to Dismiss and in support avers as follows:

1. Defendant Counsel has submitted a barrage of case law that addresses Cases in which Facebook disapproved of the content being complained of in each case for various reasons, and in accordance to Facebook Policies.
2. The current case before this court is unique from the cases referenced by the defense, in that the contents were approved by Facebook.

   Addressing Plaintiff agreement at Section A:
3. Defendants seek to mislead this court in integrating Section 230(c) (1) of the CDA in this case, which is not applicable to the facts in this case.
4. Congress provided immunity under Section 230 to online service providers for all claims stemming from third party content appearing on or through the service provider's platform ("No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.").
5. Generally speaking, courts have construed the immunity provisions in Section 230 broadly in cases arising from the publication of user-generated content. In short, Section 230(c)(1) protects: (a) a provider or user of an interactive computer service (b) that the plaintiff seeks to treat as a publisher or speaker (c) of information provided by another information content provider.
6. Counsel on page 5-6 of their motion notes, "Under Section 230(c)(1) of the CDA, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Accordingly, Facebook is entitled to immunity if: (1) it is a "provider . . . of an interactive computer service;" (2) the allegedly offending content was "provided by another information content provider;" and (3) Plaintiff's claims treat Facebook as the "publisher" of that content. Id. The Complaint reveals that all three requirements for Section 230(c)(1) immunity are met."

7. Defense counsel's use of 230 ( c ) (1), noting that all three requirements were met in this case are clearly false and misleading assertions.
8. In this current case, unlike the barrage of cases quoted by defense counsel, again, the content being addressed was not offensive nor offending. Facebook approved the contents for circulation as a boosted ad.
9. Likewise, nowhere in Plaintiff complaint, does Plaintiff treat Facebook as the "publisher" of any content.
10. When ads are boosted, the account holder click a section in the ads application to indemnify and hold Facebook harmless for the content of political ads.
11. Therefore, defense counsel's use of Section 230 ( C ) ( 1) in this case is clear not applicable to the facts presented in Plaintiff complaint to this court.
12. Plaintiff complaint seek to hold Facebook, Inc. liable for the conduct it engaged against the Plaintiff in this case through its employer.
13. As Facebook, Inc. list its business number for the public to contact them, and both of the employers were reached and contacted using Facebook, Inc public contact number, and emails, which indicate that they are employers working for Facebook.
14. Under a legal doctrine sometimes referred to as "respondeat superior" (Latin for "Let the superior answer"), an employer is legally responsible for the actions of its employees.
15. The courts noted that this rule applies only if the employee is acting within the course and scope of employment. In other words, the employer will generally be liable if the employee was doing his or her job, carrying out company business, or otherwise acting on the employer's behalf when the incident took place.
16. The purpose of this rule is fairly simple: to hold employers responsible for the costs of doing business, including the costs of employee carelessness or misconduct.
17. This court action again is about Facebook's conduct in the course and manner it conducted itself with the Plaintiff that violates its contractual agreement with the Plaintiff as noted within Plaintiff complaint to this court.

Addressing Plaintiff agreement at Section B:

18. Defendants are correct just leaving out specific wording at page 9, when they state, " …. Plaintiff claims that Facebook violated its implied duty of good faith and fair dealing to her in two ways: 1) by ceasing to circulate her boosted Facebook ad (Compl. at 1 & 4, ¶ 19); and 2) by "locking" her out of her account after she "attempted unsuccessfully to secure" it (Compl. at 1 & 3, ¶¶ 12, 14;) (Plaintiff insert: (3) As well as the lack of oversight of the conduct of their employees that operate their telephone lines and as well as address users experiencing difficulty with their services.) as <u>which Plaintiff alleged amounted to termination without notice by Facebook</u>." See Defendants Motion to Dismiss at page 9, lines9-12.
19. Attached is a list of similar public view complaints alleging similar conduct by Facebook, which appear to show a pattern of bad faith and bad dealing conduct by Facebook, which results in lockouts that amount to terminations. (see Plaintiff Exhibit No. 1 to Plaintiff Response to Defendants Motion to Dismiss)
20. However, Defendants are incorrect when they allege that, "…Plaintiff fails to plead facts on which the Court could conclude that either of these alleged actions constituted a breach of

any express or implied obligation...". See Defense Motion to Dismiss at Page 9 @ lines 12-13.

21. Plaintiff contend that, "Facebook, Inc agreement listed in its Statement of Rights and Responsibilities represents it contract to it users. is to provide users access to Facebook's services subject to certain terms and conditions.
22. Likewise, a "Terms of Service" aka "Terms of Use" is a <u>contract</u> and agreement that lists the rules for what users can and can't do on a website, app, or other product or service. It also states what the website owner is legally responsible for or not.

23. Facebook policies clearly state, "2. Account suspension or termination....
<u>If we determine that you have violated our terms or policies, we may take action against your account to protect our community and services, including by suspending access to your account or disabling it. We may also suspend or disable your account if you create risk or legal exposure for us or when we are permitted or required to do so by law. Where appropriate, we will notify you about your account the next time you try to access it....</u>
If you delete or we disable your account, <u>these Terms shall terminate as an agreement between you and us, ..."</u>

24. Therefore, Defendants conduct constituted a breach of both and expressed and implied obligation when it clearly noted in its agreement that it, reserves the right to terminate the accounts of users who violate Facebook terms of service; Rights & Responsibilities; Yet, Facebook arbitrarily terminated Plaintiff Accounts, despite the fact that Plaintiff did not violate any of Facebook terms of services.
25. Plaintiff did not violate any of Facebook terms of services agreement and/ or policies. Plaintiff ads were approved, and their existed no offending conduct which is why Plaintiff ads were approved by Facebook. Yet, Plaintiff account was disabled. Plaintiff was locked out of her account as she noted in her complaint, and was not allowed back into her account until after Facebook received notice of this law suit addressing their conduct in a court of law.
26. Plaintiff contend that Facebook's conduct amounted to a termination, that's contrary to Facebook's expressed terms of services in its contract with its users.
27. Facebook policies notes, "If you delete or we disable your account, <u>these Terms shall terminate as an agreement between you and us..."</u>
28. Therefore, again, through Facebook expressed language, the conduct Facebook engaged in, in disabling my account amounted to a termination of services, without just cause, and in violation of their contractual agreement with Plaintiff as a user.

29. Plaintiff suffered injury in that interactions on my community page suffered very low viewings as noted by Plaintiff Exhibit 2, Printout out showing the negative reviewings from Facebook. Plaintiff was unable to communicate with viewers that sought to share their legal experiences, in which they believed they were unjustly treated. Plaintiff was unable to respond to requests of viewers that frequented her community page. Plaintiff was unable to experience viewing the birth of her newest grandson, since Plaintiff was unable to access the facetime live component of Facebook in which members can talk and view each other using live video. Plaintiff experienced total stress as a result of what has become an addiction to Facebook website program. Plaintiff was unable to upload pictures of videos and pictures

that were taken during the time Plaintiff account was disabled/ terminated by Facebook. Plaintiff suffered headaches and stress as a result of not being able to communicate with other on Facebook, as Plaintiff live a very reclusive life style with limited interactions with others outside of her employment.

30. Plaintiff contend that, Facebook, failed to provide oversight of its employees, and that they do not expressly reserve the right to terminate an account for any reason, and indicates in its Statement of Principles therefore Plaintiff should not have had her presence on the Facebook Service removed for reasons other than those described in Facebook's terms of service, Statement of Rights and Responsibilities."
31. Plaintiff again view the Defendants conduct as a breach of both and expressed and implied obligation, as Plaintiff also described the conduct in detail in Plaintiff complaint to this court.
32. While Facebook has policies in place for its users, its employees that carry out these policies appear to disregard their application as it relates to Facebook users. They show disregard to Facebook users, as noted by the contents of Plaintiff complaint- referencing sarcasm and extortion, that Facebook users are subjected to when they contact numbers that Facebook advertise as their Corporate Head Quarters contact number.
33. With respect to Defense Counsel's assertion at page 9, Lines 14-15, Defendant's note, "…Plaintiff does not identify any language in Facebook's terms that could create an implied duty for Facebook to continue circulating her ads.
34. Facebook notes limited information about its ads, but defers on its page to language that describes the process for boosting ads, and gives a description regarding community pages that both are included in Plaintiff complaint to this court. Facebook also defers to supplemental information that is available on its sites for view for prospective ad boosters.
35. Facebook also notes that, " Some of the Products we offer are also governed by supplemental terms. If you use any of those Products, supplemental terms will be made available and will become part of our agreement with you. For instance, if you access or use our Products for commercial or business purposes, such as buying ads, selling products, developing apps, managing a group or Page for your business, or using our measurement services, you must agree to our <u>Commercial Terms</u>…"
36. Therefore, Plaintiff describes the process of boosting ads, as well as give information regarding community ads, and clearly notes her claim regarding a breach of contract with respect to the failure of Facebook to circulate ads they approved for the Plaintiff, prior to disabling amounting to termination of Plaintiff account.
37. While Facebook notes supplemental ads policies, its reasonably implied that if you boost an ad, and Facebook approves the ad and send you email and text of the approval, and notes that the ad will begin circulating that they will adhere to and uphold their words.
38. Defendants at page 9 lines 18-19 notes another knowingly misleading assertion stating, "…This Court dismissed a similar implied covenant of good faith and fair dealing claim for this reason in Young v. Facebook. In that case, the plaintiff alleged that Facebook violated the covenant of good faith and fair dealing by not showing concern or offering assistance when its computer system flagged plaintiff's account, but the plaintiff failed to "point to any express or implied obligation requiring Facebook to show such concern or offer such assistance," and the claim failed for that reason. Young, 790 F. Supp. 2d at 1118."

39. However, that court decision in Young v. Facebook is clear that, "Young's complaint did not allege that the termination of her account was undertaken in bad faith or violated Facebook's contractual obligations.
40. Instead, Young alleged that she was deprived of human interaction the process surrounding the termination of her account. The termination provision of the Statement of Rights and Responsibilities provides that when a user account is terminated, Facebook "will notify you by email or at the next time you attempt to access your account." Id. Given the express language, Facebook could not have an implied obligation to provide a different termination process."
41. Young also inappropriately raised constitutional claims, but the court noted that, "Facebook isn't a state actor despite "contracts between Facebook and the General Services Administration allowing Facebook pages for federal agencies."
42. The court in Young vs, Facebook noted that, "… As with all contracts, Facebook has an implied duty not to frustrate the other party's right to receive the benefits of the agreement actually made. The agreement in this case is to provide users access to Facebook's services subject to certain terms and conditions. While users do not pay for the services directly, Facebook benefits from user activity through the sale of advertising. Facebook expressly reserves the right to terminate the accounts of users who "violate the letter or the spirit of this Statement, or otherwise create risk or possible legal exposure" for Facebook, Compl. Ex. A-2, but it does not expressly reserve the right to terminate an account for any reason, and indicates in its Statement of Principles that users "should not have their presence on the Facebook Service removed for reasons other than those described in Facebook's Statement of Rights and Responsibilities." Compl. Ex. B-1. It is at least conceivable that arbitrary or bad faith termination of user accounts, or even termination of user accounts with no explanation at all, could implicate the implied covenant of good faith and fair dealing."
43. Further commentary by Samantha Kuhn (a 2L at the Harvard Law School) in an Article titled, "Young v. Facebook, Inc.: District Court Dismisses Facebook User's Claims that Account Termination Violated First and Fourteenth Amendments and Various State Laws" edited by Matt Gelfand November 09, 2010 Young v. Facebook, Inc., 5:10-cv-03579-JF/PVT (N.D. Cal. Oct. 25, 2010) w/ opinion hosted by Justia.com
44. "The court found that the way in which Facebook terminated Young's account did not breach the covenant of good faith or fair dealing because the termination procedure was set by the Statement of Rights and Responsibilities, it seems to have kept open the possibility that arbitrary or capricious termination of an account could constitute actionable bad faith. If a court finds merit in a bad-faith claim, interactive service providers could see increased responsibility and a new burden to explain questionable or unjustified decisions.

45. Again, defense counsel statement on page 10, lines 11-14 is intentionally misleading, 15-16, "…that she was locked out of her account **after** she reposted her ad numerous times and then "attempted unsuccessfully to secure [her] account."
    1. In this case, I plaintiff boosted a post that I shared that consisted of my now deceased transgender son treatment and experience in a local North Carolina Hospital.
    2. My ad was initially approved on January 13, 2019 at 12:19am. With the email Noting: Your ad is approved and should begin delivering shortly. See Plaintiff Exhibit No. 1

3. However, the problem was Facebook never started circulating that ad in accordance to their policy on boosting.
4. Therefore, I notified Facebook via their help- support page that my newest approved boosted ad, has yet to be put into circulation.
5. I received help through their support team that informed me to reset my ads manager, and try reposting.
6. I reposted several times receiving additional approvals on Jan 13, 2019 at 1:05pm; Jan. 13, 2019 @ 11:05 pm; Jan. 14, 2019 @ 1:19am; Jan. 15 @ 8:33pm; Jan. 16 @ 12:01am; Jan. 16 @ 3:44pm; and Jan. 17, 2019 @ 1:05am. Still my ad was not circulating – which was the reason for the multiple postings. (See Plaintiff Exhibit #2 Emails of approval dates)
7. I contacted Facebook help & support page to no avail.
8. On Jan. 17, 2019 at 8:33pm, I received an email notifying me that, see copy & paste from email: (Plaintiff Exhibit No. 3)

It looks like someone may have accessed your Facebook account. To secure your account, you'll need to answer a few questions and change your password the next time you go to Facebook.

For your protection, no one can see you on Facebook until you secure your account.

Thanks,
The Facebook Security Team

9. After receiving this email, I attempted unsuccessfully to secure my account by verifying my identity.
10. I repeatedly correctly verified my identity numerous times only to be given the same code which notes that it is expired 447256, and getting the following message repeatedly:
"In order to keep your information secure, we've locked your account. Before we can unlock it, please verify your identity and change your password.
Your account will remain hidden until you complete this process.
(Plaintiff Exhibit No. 4- multiple recovery codes Pages 1-42 w/ additional 35B & 39B totally 44 pages)
46. Plaintiff reposted at the request of Facebook employee due to non-circulating approved ads. Counsel intent is to make it appear that the multiple reposting caused an alarm, conduct which is not so. As security personnel at Facebook assisted with me with the Multiple postings. It is through the multiple postings, the sarcastic email and phone calls to Facebook employees that I realized that my account was intentionally disabled without just cause.
47. The following message continue to appear, with each verification of accurate information, "…support indicating that the purported lock-out was put in effect "[f]or [her] protection," because it appeared "like someone may have accessed [her] Facebook account," and, furthermore, that she could unlock the account by "answer[ing] a few questions" and changing her password.
48. Defendants claim that the lock-out was for my protection, this statement is not supported by the evidence in this case, as Facebook repeatedly received my accurate information to verify my account, but continued to keep my account disable-which according to Facebook's policy constituted a termination.  As noted by the numerous attempts to secure my account,

it is without dispute that the lock out was not for my protection, it was intentional, in bad faith.
49. As Plaintiff notes in her complaint to this court, Good faith (law) In contract law, the implied covenant of good faith and fair dealing is a general presumption that the parties to a contract will deal with each other honestly, fairly, and in good faith, so as to not destroy the right of the other party or parties to receive the benefits of the contract.
50. In this case, there existed no good faith, nor fair dealing.
51. Plaintiff posts did not violate Facebook's terms nor policy for its users, so there was no reason to ban, lock, nor terminate Plaintiff from having access to both her personal and business Facebook accounts.
52. Plaintiff verified her business account via US Mail, providing Facebook with her Identification card, as well as Facebook sending mail to Plaintiff address to verify that Plaintiff had a residence here in the United States.
53. Plaintiff's boosted ads were approved by Facebook.
54. Defendant employee took offense to the boosted ads, and acted in bad faith by using his position as a Facebook Manager to censor my ads, infringe on my right to free speech, by preventing the circulation of my new ad, and deactivating my ads that were supposed to be active, by stopping their circulation mid-December, yet allowing my ads to be listed in ads manager as active, while at the same time charging me for ads that were not being circulated. As the ads noted active, but were not in circulation as paid for by the terms of the circulation -payment agreement with respect to audiences reached on a daily basis by Facebook. I am blocked/ banned/and denied access to/ from using and having access to both my personal account and my business page. Using his position to prevent me from having access to my Facebook accounts, along with Babulal Sarkar then being intentionally sarcastic via his email to my email account as previously noted, coupled with the extortion attempt with the Google Play Card required for unblocking at a cost of $100, are reflective of bad faith, and unfair dealings.
55. Facebook does have to follow the rules it sets out in its terms of service. A website's policies and Terms of Service are generally considered a contract between the user and the website owners. So, while a company may be able to institute whatever policies they want, they generally have to adhere to what they have written in the Terms of Service.

PLAINTIFF FURTHER REINSTATE HER CONTENTION THAT:

1. It's every individual citizen's right to refuse to disseminate content that is considered, by them, to be inappropriate. So, Facebook, as a private entity, have the right to create a policy that censors content that its members post online along with the traditional censored speech such as cyberbullying and harassment, direct threats, and threats of sexual violence or exploitation.
2. Facebook policy states that "…If we determine that you have violated our terms or policies, we may take action against your account to protect our community and services, including by suspending access to your account or disabling it. We may also suspend or disable your account if you create risk or legal exposure for us or when we are permitted or required to do so by law. Where appropriate, we will notify you about your account the next time you try to access it…"

3. However, arbitrary and capricious action of the defendant in this case violates their clearly written terms of service agreement, as well as the implied covenant of good faith and fair dealing as referenced in California Contract Law.
4. As the court in Young's case noted, "It is at least conceivable that arbitrary or bad faith termination of user accounts, or even termination of user accounts with no explanation at all, implicates the implied covenant of good faith and fair dealing." Young vs. Face Book, Inc. Case Number 5:10-cv-03579
5. Plaintiff, should at least be notified and afforded some meaningful opportunity to be heard before being prohibited from participating on Facebook as a user with the email of sohara1966@aol.com and the Community Page: Advocates for Equal Justice, especially when there is no evidence of any wrong doings, nor know evidence that any provisions and/ or terms of services as listed in Facebook terms of service; Rights & Responsibilities were violated by the Plaintiff in this action.
6. That after Counsel was appointed to litigate this case, Facebook, has restored Plaintiff Account.
7. However, Plaintiff account is still affected in that Plaintiff have to repeatedly receive a 6 digit passcode each time Plaintiff seek to access her account, conduct that others business account holder are not subjected too.

WHEREFORE Plaintiff amend her request as follows, that:

1. Defendants Motion to Dismiss be denied.

**IN THE ALTERNATIVE, that this case be settled for the following stipulation.**

2. Plaintiff request full restoration of her Facebook accounts associated with her email Sohara1966@aol.com with out have to request a 6 digit pin each time she accessed her account.
3. That Plaintiff be awarded $400 filing fee, plus $100 case preparation, copies, and copies fees.
4. That a fee of $24,500.00 be awarded for the intentional stress and the overall unprofessional and rude conduct complained of in Plaintiff, resulting from Facebook's lack of oversight of its employees.
5. With a total cost of $25000, and that Facebook address the individuals involved with the conduct complained of in this case.

Dated: April 8, 2019.

Respectfully submitted,

*Sandra O'Hara-Harmon*

Sandra. O'Hara- Harmon
815 F Street
Hartsville, SC 29550
Sohara1966@aol.com